Ayers *vs.* Daly.

ASHER AYERS, plaintiff in error *vs.* DENNIS DALY, defendant in error.

(JACKSON, Judge, having been of counsel in this case, did not preside.)

1. A bill for account cannot be turned by amendment into an action for breach of warranty as to the quality of goods sold by the defendant to the plaintiff in an accounting which took place; more especially, if at the time of making the amendment, a separate action on the warranty would have been barred by the statute of limitations.

2. Where the bill touching a Confederate transaction alleges no conversion of any part of the goods delivered to the defendant for sale and no failure to return goods unsold, but claims the proceeds of sales made, it is error to decree for the value of the goods in United States currency at the time when they ought to have been accounted for, instead of the value of the proceeds of a fair sale when the goods were or ought to have been sold.

3. The bill cannot be amended before the master.

Equity. Amendment. Statute of limitations. Damages. Before Judge HILL. Bibb Superior Court. April Term, 1875.

Ayers *vs*. Daly.

During October, 1864, and February, 1865, Daly deposited with Ayres certain goods which the latter was to sell on commission. They yielded over $12,000 00 in Confederate money. While some of this money was in hand, Ayres agreed with Daly to invest the same in cotton under shelter. This was a gratuitous undertaking for the accommodation of the bailor, and without compensation to the bailee. About the month of May, 1865, the parties had a settlement. Ayres rendered an account of sales, and turned over to Daly warehouse receipts for twenty-nine bales of cotton, which, at seventy-five cents a pound, would equal the amount which was to have been invested. Certain of the goods remaining unsold were returned, and the settlement was treated by the parties as full and complete.

No attention was given to the cotton until the fall of 1865, when much of it was found to have been damaged and wasted, and only part of it under shelter. Six bales had never been under shelter, but lay all the time in the warehouse yard, which fact appears to have been previously known directly to neither party. Shortly after ascertaining the condition of the cotton, Daly brought suit against Ayres for reclamation on account of its bad order and waste. This action was never tried, but is still pending.

In 1869 Daly filed his bill praying that Ayers might be compelled to account for the amount received by him for the sale of the goods bailed, and to pay what should be found equitably due on account of said sales; also that the receipt given by the bailor on the settlement might be delivered up and canceled, and for general relief. The bill charged the bailment of the goods; that the goods were sold; that Ayers represented he had invested a portion of the proceeds in cotton; the settlement as to the same, the delivery of the warehouse receipts, the bad condition of the cotton, etc.

The case was referred by the court to a master. In the course of the proceedings before him, in January, 1875, complainant amended his bill, charging that when the settlement was made he supposed that his money had been invested in

Ayers *vs.* Daly.

the cotton covered by the receipts, but in fact it had not been. That the defendant had mingled that money with his own, and therewith bought several lots and varieties of cotton indiscriminately in his own name; that had he invested complainant's money specifically in cotton, as he agreed to do, and might have done, and taken reasonable care of the cotton, complainant would have realized therefor $5,000 00, or other large sum; and that by his failure so to do complainant had been injured and damaged in the aforesaid amount. The amendment prayed an account for the twenty-nine bales of cotton called for in the receipts or the full value thereof, and for general relief in that behalf.

The defendant demurred, before the master, to the bill as amended, on the following grounds: 1st. for want of equity; 2d. because of a complete remedy at law; 3d. because the matter of the amendment was a distinct cause of action; 4th. because said matter had not accrued within four years, and was barred by the statute of limitations; 5th. because the bill was not amendable, the case being before a master.

The master allowed the amendment, overruled the demurrer, heard evidence and made his report, which was to the effect that Ayers had fully accounted for all of the goods of Daly which had come into his possession except thirty-one and three-fourths gallons of peach brandy, which he found to have been worth $5 00 per gallon at the date of the settlement before alluded to. He therefore reported that Daly should recover of Ayers $158 75. To this report both parties excepted; Ayers, because the master considered the amendment filed while the case was before him and heard evidence thereunder; because he overruled his demurrer to the bill, and because the finding as to the brandy was contrary to the evidence; Daly, mainly because the master had found that Ayers was neither liable for the twenty-nine bales of cotton before alluded to, nor for the six bales thereof which had never been under shelter.

The questions arising upon the exceptions were submitted to the chancellor without the intervention of a jury. He

sustained the report except in two particulars, to-wit: 1st. He allowed interest in favor of Daly on the value of the aforesaid peach brandy from the date of the settlement. 2d. He found that Ayers was liable for the difference in value between the six bales of cotton in their actual condition, and in the condition represented in the cotton receipts, with interest from the date of the settlement. This difference he placed at fifteen cents per pound. It was decreed accordingly. To this judgment Ayers excepted.

NISBET, BACON & HINES; R. F. LYON, for plaintiff in error.

LANIER & ANDERSON, HILL & HARRIS, for defendant.

BLECKLEY, Judge.

Bailment of goods to be sold, reception of the proceeds, and failure to pay them over, will constitute a complete cause of action. Gross negligence in executing a separate agreement to invest the proceeds of sale in cotton, and damage therefrom, will constitute another complete cause of action. Warranty, express or implied, as to the quality of cotton turned over in place of money retained or misappropriated, and breach of such warranty, will constitute another complete cause of action. The whole record, taken together, discloses two bailments, and an intermediate agreement to invest in cotton the Confederate money which had already been derived from the sale of goods embraced in the first bailment. Thus far there is certainty. Another contract possible to be inferred from the facts, is one of implied warranty as to the cotton. This contract, if one at all, dates in or about May, 1865, and arises out of the accounting which then took place. The uncertainty which environs it is due chiefly to the doubtful manner in which Ayers executed his undertaking to invest in cotton. If, instead of investing Daly's money in this cotton, the cotton was his own, and he, for that reason, is to be regarded as selling it to Daly when he turned over to him the warehouse receipts, then there may be no obstacle to rais-

Ayers vs. Daly.

ing an implied warranty as to quality.   On the other hand, if Daly's money was invested in this cotton, there is no semblance of warranty, whatever room there may be for an action founded on gross negligence in executing the agreement to invest.  The original bill was grounded on bailment, and was in the nature of an action for money had and received.   It went for the proceeds of goods sold, and alleged that the goods *were* sold.   It prayed for an account of the amount received from sales, and for payment of such amount as might be found equitably due on account of said sales.   It repudiated the accounting which had taken place, and prayed for the cancellation of the receipt which the complainant had given on that occasion.   It stood upon the complainant's right to the money which had accrued from the sale of his goods.   It made no charge that any of the goods were unsold, or that any of them had been converted by the defendant, or that any demand had been made for their return, or that there was any default in not returning them.   It made no charge that the defendant had agreed to invest the proceeds in cotton, or that he had made any breach of such agreement, or that he was under any obligation to invest the money or to exercise any care or diligence touching the investment of it, or touching the protection or preservation of any cotton.   The defendant's agreement to invest came out in the amendment and in the evidence, but was not alleged in the original bill.   The sole contract set up by the latter was the contract of bailment; and the breach of it alleged was in failing to account for and pay over the proceeds of sale.   It was averred that the goods were sold whilst the complainant was absent in the military service; and that averment, with the dates of bailment and other facts in the case, show that it was not expected that other than Confederate money would be received for the goods; and it is not alleged or proven that any other was received.   The original bill, properly construed, was simply a suit to avoid the prior receipt, and to recover the money which the goods produced, or its value, offering to allow credit for commissions, and for the amount actually realized from a sale of the cotton.

1. Thus construing the bill, we think it was not amendable so as to turn it, in whole or in part, into an action for breach of warranty as to the quality of any part of the cotton turned over in the accounting which had taken place between the parties. That accounting was repudiated by the complainant and he fell back upon his original right. He sued for the consideration which he gave for the cotton, and he was not entitled to reclaim that and at the same time contend for the difference between the value of the cotton as it was and the value of it as it ought to have been. Inasmuch as he retained the cotton, treating it as sold to him by the defendant, its value as it was would, on that theory, be the measure of the credit for it to which the defendant would be entitled. And to limit the credit thus is consistent with the bill; whereas, to decree affirmatively for the difference between the value of the cotton as it was and its value in a better condition, would be appropriate to a wholly different action. The chancellor, acting on the idea of implied warranty, modified the master's report, and rendered such a decree as to six bales of the cotton. Such a recovery could rest, perhaps, in a court of law, either on a breach of warranty or on a failure to exercise due care and diligence in executing the agreement to invest—on the former, if the cotton was not bought with complainant's funds, and on the latter if it was. But neither warranty nor agency to invest is averred in the original bill; and the breach as to either would be a new and distinct cause of action from that which is averred therein. Moreover, the amendment was not filed until an action on the supposed warranty, if then first brought, would have been too late; and the bar of the statute would probably have applied equally to an action for the omission of diligence in executing the agency to invest.

2. The exception by the defendant to the master's report, as to the item of brandy, ought to have been sustained. The brandy was valued, not as an article sold for Confederate money while the complainant was absent in the military service, but as if it had remained on hand at the time of settle-

Ayers *vs.* Daly.

ment in May, 1865, and was then worth so much in United States currency. The bill contained no allegation, and there was properly no evidence, warranting it to be thus dealt with. When a party sues for one grievance he must not recover for another.

3. No authority has been produced to us, and we know of none, for the novel and extraordinary practice of amending a bill before the master. On principle, we are clear that the master has nothing to do with receiving amendments. He is to act on such pleadings only as belonged to the case when it was referred to him. The judge orders the reference because the pleadings, as they stand, are ready for the master's work, and make a case needing his services. If the case could undergo changes before the master himself, by amendments submitted to him, the very reasons which induced the reference might be amended away, and the master's functions be made wholly useless. Each amendment to the bill, if important enough to vary materially the complainant's case, reopens the bill to demurrer. After such an amendment the judge, if aware of it, might not want the master's services. It seems to us wholly inadmissible for the latter to proceed as he did in this case, taking cognizance of an amendment, hearing it on demurrer, overruling the demurrer, and taking evidence touching the new facts alleged. This is turning the master's office into a court of equity, and for the time being, raising the master to the office of judge. It may be that under our broad statutory provisions the pleadings are amendable without special leave, while the case stands on a reference, but if so, the amendments are to be filed, not with the master, but in the clerk's office; and for them to reach the master some order of the court or of the judge would be necessary. In the absence of such an order, the master should proceed without noticing them, dealing with the case as it existed when it was referred.

Judgment reversed.